UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SHEMAN REDD BERNARD                    CIVIL ACTION NO. 6:20-cv-01419

VERSUS                                 JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL             MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the court is an appeal of a partially favorable decision regarding the claimant's alleged disability.  Considering the administrative record, the parties' briefs, and the applicable law, and for the reasons set forth below, it is recommended that the decision should be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Sheman Redd Bernard, fully exhausted her administrative remedies before initiating this action.  She filed an application for disability insurance benefits,[1] an application for supplemental security income benefits,[2] and an amended application for benefits,[3] collectively alleging that she became disabled

---

[1]     Rec. Doc. 7-1 at 162.

[2]     Rec. Doc. 7-1 at 164.

[3]     Rec. Doc. 7-1 at 170.

on May 27, 2009.  Her applications were denied.[4]  She requested a hearing, which was held on October 2, 2019, before Administrative Law Judge Carol Lynn Latham.[5] The ALJ issued a decision on February 3, 2020, concluding that Ms. Bernard was not disabled within the meaning of the Social Security Act through December 31, 2014, the date on which she was last insured for Social Security disability benefits, but also concluding that she had been disabled since November 7, 2016.[6]  Ms. Bernard asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[7]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review.[8]  Ms. Bernard then initiated this action, appealing the Commissioner's decision.

## Summary of Pertinent Facts

Ms. Bernard was born on February 10, 1970,[9] and was just a few days shy of her fiftieth birthday when the ALJ issued her decision.  Ms. Bernard is a high school graduate[10] and took community college classes in cosmetology and private

---

[4]      Rec. Doc. 7-1 at 80, 82.

[5]      A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 30-61.

[6]      Rec. Doc. 7-1 at 14-24.

[7]      Rec. Doc. 7-1 at 4.

[8]      *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[9]      Rec. Doc. 7-1 at 32, 62.

[10]     Rec. Doc. 7-1 at 35, 162, 164.

security.[11]  She previously worked as a cook in a restaurant and a residential facility and as a cafeteria worker and custodian for the Lafayette Parish School Board.[12]  She alleged that she became disabled on May 27, 2009[13] due to a ruptured disc at L5 S1, low back pain, and right leg pain[14] resulting from a slip and fall incident at work.[15]

An MRI of Ms. Bernard's lumbar spine, obtained on July 7, 2009, showed a minor left lateral disc herniation at L5-S1 with no evidence of nerve root displacement or compromise.[16]  A lumbar spine myelogram on March 1, 2010 was normal.[17]  A post-myelogram lumbar spine CT of the same date showed a small central broad-based disk herniation at L5-S1 with no definite nerve root displacement or compromise.[18]  EMG and nerve conduction studies of the right leg and low back were normal on March 30, 2010.[19]

---

[11]     Rec. Doc. 7-1 at 36.

[12]     Rec. Doc. 7-1 at 199.

[13]     Rec. Doc. 7-1 at 170, 188.

[14]     Rec. Doc. 7-1 at 188.

[15]     Rec. Doc. 7-1 at 33, 41, 522.

[16]     Rec. Doc. 7-1 at 285.

[17]     Rec. Doc. 7-1 at 279.

[18]     Rec. Doc. 7-1 at 278.

[19]     Rec. Doc. 7-1 at 277.

On August 17, 2010, Ms. Bernard saw Dr. Steven K. Staires for lumbar discography at L3-4, L4-5, and L5-S1.[20]  She told Dr. Staires that she was injured in May 2009 when she slipped on a wet floor and fell on her right buttock.  A series of lumbar epidural spinal injections had provided fifty percent relief for approximately three to four weeks without sustained improvement, and she was considering lumbar surgery.  Physical therapy had helped initially but eventually worsened her pain.  Ms. Bernard complained of constant throbbing midline and right lumbar pain with intermittent burning pain to the right buttock, down the lateral aspect of the right leg and into the lateral foot.  She also complained of intermittent swelling of the right foot and intermittent numbness to the lateral aspect of the right leg and foot.  She reported that her pain worsened when she stood for more than ten minutes, sat for more than twenty minutes, or bent forward.  Examination showed tenderness, a restricted lumbar range of motion, negative bilateral straight leg raise tests, and no swelling of the extremities.  Her right foot felt slightly cooler than the left.  Pedal pulses could not be palpated on the right.  Discography was performed.  Dr. Staires's impressions were post-traumatic lumbar pain, lumbar sprain; herniated nucleus pulposus at L5-S1; lumbrosacral radiculitis; and discogenic syndrome at L5-S1.  In his opinion, Ms. Bernard's symptoms suggested early complex regional pain

---

[20]     Rec. Doc. 7-1 at 280-282.

syndrome of the right lower extremity because there was autonomic instability with coldness and only Doppler pulses were detectable in her right foot.  A CT scan of the lumbar spine with contrast, obtained the same day, showed degenerative disc disease at L5-S1.[21]

A November 8, 2012 MRI of Ms. Bernard's lumbar spine was positive for a central and left lateral broad-based disc herniation at L5-S1 with a well-defined 1 cm extruded disc fragment extending into the anterior epidural space abutting the left S1 nerve root.[22]

Ms. Bernard treated with Dr. Michel E. Heard, a board-certified orthopedic surgeon in Lafayette, Louisiana, monthly between May 29, 2013 and December 23, 2013.[23]  At each appointment, Ms. Bernard complained of constant mid-back pain rated 8 or 9 out of 10 as well as constant, burning, aching low back pain also rated 8 or 9 out of 10.  Sitting straight leg raise tests were positive at five of the visits.  She used a cane at each appointment and limped at two of them.  Dr. Heard's impressions at each visit were:  mid back pain, low back pain with right radiculitis and disc herniation at L5-S1 with instability, chronic pain syndrome/insomnia, and positive valid lumbar discogram in the face of discogenic pain.  In the treatment notes for the

---

[21]     Rec. Doc. 7-1 at 288.

[22]     Rec. Doc. 7-1 at 273.

[23]     Rec. Doc. 7-1 at 312-323, 269-272.

three later visits, he added "delay/denial of recommended lumbar surgery by workers' comp agents" to the list of impressions.  He prescribed Zanaflex, Mobic, Trazadone, Neurontin, and Ultram at each visit.  Dendracin Topical and Medi-Derm cream were added occasionally.  At each appointment, Dr. Heard noted that the medications were helping.  The treatment notes also indicated that Ms. Bernard received two trigger point injections of Celestone.  Her motor and reflex exam was intact at each visit.  Dr. Heard also noted that spine surgeon Dr. McDonnell had recommended instrumented lumbar fusion surgery.  In Dr. Heard's opinion, Ms. Bernard was not able to lift more than ten pounds, not able to sit or stand more than twenty minutes at a time, and not able to work in any capacity.

Ms. Bernard continued to see Dr. Heard monthly in 2014, except for February, April, and September.  In January,[24] Dr. Heard noted that Ms. Bernard was having sadness, insomnia, depression, and loss of interest in things; he added depression to his impressions.  In March,[25] Dr. Heard recommended that Ms. Bernard obtain a second opinion from spine surgeon Dr. Ray Williams.  In May,[26] Dr. Heard noted that Ms. Bernard had seen Dr. Gunderson.  In June,[27] Dr. Heard noted that Ms.

---

[24]     Rec. Doc. 7-1 at 310-311.

[25]     Rec. Doc. 7-1 at 308-309.

[26]     Rec. Doc. 7-1 at 306-307.

[27]     Rec. Doc. 7-1 at 304-305.

Bernard's pain increased with lumbar flexion and extension and after sitting or standing in the same position for more than twenty minutes.  He added Lidoderm patches to her medication regimen.  Dr. Heard's treatment note from July 15, 2014[28] stated that he reviewed Dr. Clark Gunderson's record from the same date, in which Dr. Gunderson opined that Ms. Bernard had a disc herniation with complex regional pain syndrome, a positive discogram, and needed a psychological evaluation, but did not need lumbar surgery.  When Ms. Bernard saw Dr. Heard the next day, July 16, 2014, he prescribed Celebrex, Trazadone, Zoloft, Lidoderm patches, and Ultram.[29] In August,[30] Ms. Bernard received a trigger point injection of Celestone in the right paralumbar area.  Dr. Heard agreed with Dr. Gunderson that she should have a psychological evaluation and see an interventional pain specialist.  In his opinion, proceeding to surgery without those evaluations would put Ms. Bernard at risk for failure.  In October, Dr. Heard prescribed Flexeril, Neurontin, Trazadone, Zoloft, and Ultram.[31]  In November, Ms. Bernard's pain level was down to 6 out of 10,[32] but

---

[28]     Rec. Doc. 7-1 at 303.

[29]     Rec. Doc. 7-1 at 301-302.

[30]     Rec. Doc. 7-1 at 299-300.

[31]     Rec. Doc. 7-1 at 297-298.

[32]     Rec. Doc. 7-1 at 295-296.

it increased again in December.[33]  Dr. Heard did not report a positive straight leg raise test in 2014, his impressions remained the same at each visit during that year, and he opined at each visit that Ms. Bernard was unable to work and had not reached maximum medical improvement.

On October 29, 2014, Ms. Bernard saw Dr. James H. Blackburn for a psychiatric evaluation.[34]  In his report, Dr. Blackburn summarized extensive medical records for Ms. Bernard, many of which were not included in the administrative record of this matter.  The summary documented disagreement among physicians concerning the validity of discography and whether Ms. Bernard needed lumbar surgery.  Ms. Bernard told Dr. Blackburn that she had been in constant pain since the slip and fall accident, varying in intensity from 4 out of 10 to 9 out of 10 depending on her level of activity, position, and effort.  She described her pain as a burning, at times throbbing, ache in the middle of her back, radiating down her right leg.  She also reported some coldness in her right foot and incidental neck pain.

Ms. Bernard reported some crying spells and moderate depression following her accident as well as frustration that her back was not healing.  She denied marriage or relationship problems, denied problems with memory or concentration, and denied losing interest in previously-enjoyed activities although she reported that she

---

[33]     Rec. Doc. 7-1 at 293-294.

[34]     Rec. Doc. 7-1 at 509-530.

could no longer participate in those activities due to pain and physical limitations. She denied panic attacks, feelings of worthlessness, and loss of emotional control. She reported a positive family and credited her faith with sustaining her.  She said Dr. Heard had prescribed antidepressants, but she had stopped taking them.  When she met with Dr. Blackburn, Ms. Bernard was wearing a back brace and using a cane for balance in case her leg gave way.  Although she appeared to be in some physical discomfort during the evaluation, her mood was essentially euthymic with no indication of excessive depression or anxiety.  Her thoughts were organized; her judgment was good; and her intelligence was at least average.

Dr. Blackburn diagnosed Ms. Bernard with pain disorder with physical components, lumbar disc disease and possible/probable complex regional pain syndrome.   Dr. Blackburn's testing did not reveal any pathologic degree of depression or anxiety and showed that she was participating validly in the testing. Dr. Blackburn found that Ms. Bernard did not have a psychiatric or psychological condition that was generating her pain.   He also found no psychiatric contraindication to Ms. Bernard having the orthopedic surgery proposed by Drs. McDonnell, Heard, and Williams.  Finally, he opined that Ms. Bernard did not require and would not benefit from psychiatric care.

In 2015, Ms. Bernard saw Dr. Heard every month except February and June.[35] Dr. Heard's impressions at each visit were the same:  mid back pain; low back pain with right radiculitis and disc herniation at L5-S1 with instability; chronic pain syndrome/insomnia and depression; positive valid lumbar discogram in the face of discogenic pain; and delay/denial of recommended lumbar surgery by workers' comp agents.  Throughout the year, he continued to prescribe the same medications. In the treatment notes for all visits in 2015, Dr. Heard indicated that Ms. Bernard's work status was unchanged, meaning that in his opinion, she remained unable to work in any capacity.  In January, a sitting straight leg raise test was positive at 50 degrees on the right.  In February, Dr. Heard noted Dr. Blackburn's opinion that there was no need for psychiatric treatment and no contraindication to surgery.  Ms. Bernard had positive straight leg raise tests in March[36] and April.[37]  Beginning in April and continuing through the end of 2015, Dr. Heard stated in his list of impressions that Ms. Bernard was not interested in any surgical options.  Beginning in September, he added that she was scared of surgery.  In September, Dr. Heard recommended pain management for Ms. Bernard; assigned a 10% anatomical impairment rating of her body; stated that she could stand or sit at will;

---

[35]     Rec. Doc. 7-1 at 289-292, 347-363.

[36]     Rec. Doc. 7-1 at 289-290.

[37]     Rec. Doc. 7-1 at 362-363.

recommended that she should not engage in repetitive bending; and stated that she was permanently disabled from medium, heavy, and very heavy work.  The negative implication of this last opinion is that Ms. Bernard was capable of performing light or sedentary work, which seems to contradict Dr. Heard's opinion that her work status was unchanged and, therefore, she was unable to work in any capacity.

On January 20, 2016, Dr. Heard stated that a vocational rehabilitation conference had been held on that date, Ms. Bernard had an anatomical impairment rating of 10%, she was not at maximum medical improvement, and she was approved for sedentary work.[38]  Dr. Heard did not list any specific reasons for the change in his opinion regarding Ms. Bernard's ability to work.

Ms. Bernard saw Dr. Heard in February, March, May, June, July, August, October, and twice in November 2016.[39]  Sitting straight leg raise tests were positive in October and November.  In the treatment notes for the October and November visits, Dr. Heard added a surgical recommendation to his list of impressions.  From February through October, Dr. Heard opined that Ms. Bernard was capable of performing light and sedentary work.  In the treatment note for November 7, 2016, however, Dr. Heard noted that Ms. Bernard did not have a limp, did not use any ambulatory aids, had increased pain after sitting or standing in one position for more

---

[38]     Rec. Doc. 7-1 at 346.

[39]     Rec. Doc. 7-1 at 326-345.

11

than twenty minutes, "must keep changing positions," and "is unable to work in any capacity." In the treatment note for November 29, 2016, Dr. Heard reiterated that Ms. Bernard was "unable to work in any capacity since November 7, 2016."

When Dr. Heard saw Ms. Bernard on June 1, 2017, he again opined that she had been unable to work in any capacity since November 7, 2016.[40] His impressions were the same as before, including his impression that a laminectomy/fusion was recommended even though Ms. Bernard was not interested in any surgical options and was scared of surgery.

Ms. Bernard saw Dr. Heard again on March 19, 2018.[41] She complained of mid-back and low back pain rated at nine out of ten. She was given an injection of Celestone in the right paralumbar area. Mobic and Ultram were prescribed. Dr. Heard noted that she was unable to work in any capacity. His impressions remained the same as previously stated.

More than a year later, on October 1, 2019, Ms. Bernard saw Dr. Heard again.[42] She rated her mid-back and low back pain at eight out of ten. A sitting straight leg raise test was negative. She had a limp but did not use an ambulatory aid. All of Dr. Heard's impressions remained the same. He prescribed Mobic,

---

[40]     Rec. Doc. 7-1 at 325.

[41]     Rec. Doc. 7-1 at 508.

[42]     Rec. Doc. 7-1 at 533-534.

Trazadone, and Ultram, recommended a recheck in six months, and stated that Ms. Bernard had not been able to work in any capacity since November 7, 2016.  Dr. Heard also filled out a form indicating that Ms. Bernard could stand and sit only for fifteen minutes without needing a break, could lift ten pounds occasionally during an eight-hour workday, and could frequently lift only five pounds during a workday. He indicated that she could not perform sedentary duty on a full-time basis.  He also noted that it was medically necessary for Ms. Bernard to be able to lie down flat when necessary during the workday.

The very next day, on October 2, 2019, Ms. Bernard testified at a hearing, explaining that she was injured at work in 2009 and filed a workers' compensation claim that was settled in 2017.  She stated that she met with a vocational rehabilitation counselor before the claim settled, but her medications prevented her from going back to work.  She stated that Ultram made her dizzy, nauseated, irritable, and groggy.

Ms. Bernard explained her understanding that she had a ruptured disc at L5-S1 that radiated to her right leg, which got numb and tingly.  She stated that her foot got numb and turned blue in the winter.  She stated that a recommended surgical procedure was approved by the workers' compensation carrier eight years after the accident occurred, but she elected not to have surgery because of the delay in approving the procedure, because she was older, and because a permanent fix was

not guaranteed.  She reported that a psychiatrist she consulted told her that the delay in having surgery worsened her condition.  She stated that her back and leg bothered her all the time, but some days were better than others.  She explained that she could sit or stand for about twenty minutes without changing position.  She testified that lying down relieved her pain, so she spent most of the day lying down.  She stated that cold weather and rain increased her symptoms.  She stated that she could not drive long distances because her driving leg was affected.  She said she had difficulty sleeping because it is hard for her to get comfortable in bed, but she usually napped twice a day.

Ms. Bernard stated that she could do some household chores while sitting down to wash dishes or cook a little, but her husband did most chores.  She watched TV, sat outside, grocery shopped with assistance, went to Bible class on Tuesdays, and went to church on Sundays.  She explained that she could no longer participate in fishing or other outdoor sports that she formerly enjoyed.  She explained that she stopped seeing Dr. Heard every month because she could not afford it, and he now wanted to see her every six months.  She stated that she could lift and carry only five to ten pounds.  She stated that Dr. Heard prescribed depression medication that she took when needed, but she was out of that medication at the time of the hearing.  The day before the hearing, Dr. Heard prescribed Mobic, Tramadol, and Ultram.

Ms. Bernard now seeks reversal of the Commissioner's adverse ruling.

14

## Analysis

### A.   Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[43]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[44]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[45]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[46]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[47]  Conflicts in

---

[43]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[44]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[45]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[46]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[47]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[48] and credibility assessments[49] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[50]

## B.   <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[51]  The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[52]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[48]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[49]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[50]    *Wren v. Sullivan*, 925 F.2d at 126.

[51]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[52]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

last for a continuous period of not less than twelve months."[53]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[54]

## C.   **Evaluation Process and Burden of Proof**

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[55]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[56] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in

---

[53]      42 U.S.C. § 1382c(a)(3)(A).

[54]      42 U.S.C. § 1382c(a)(3)(B).

[55]      20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[56]      20 C.F.R. § 404.1520(a)(4).

the record.[57]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[58]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[59]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[60]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[61]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[62]

---

[57]     20 C.F.R. § 404.1545(a)(1).

[58]     20 C.F.R. § 404.1520(e).

[59]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[60]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[61]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[62]     20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.**    **The ALJ's Findings and Conclusions**

The ALJ determined, at step one, that Ms. Bernard has not engaged in substantial gainful activity since the alleged disability onset date.  This finding is supported by substantial evidence in the record and was not challenged.

At step two, the ALJ found that Ms. Bernard has the following severe impairments:  lumbar degenerative disc disease and pain disorder.  This finding is supported by substantial evidence in the record and was not challenged.

At step three, the ALJ found that Ms. Bernard has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  This finding was not challenged.

The ALJ found that Ms. Bernard had the residual functional capacity to perform the full range of sedentary work prior to November 7, 2016.  The claimant challenged this finding.  The ALJ also found that, beginning on November 7, 2016, Ms. Bernard had the residual functional capacity to perform sedentary work except that she would be off task fifteen percent of the workday due to pain and the need for additional breaks (beyond the customary breaks and lunch period).  Ms. Bernard did not challenge this finding.

At step four, the ALJ found that Ms. Bernard has been unable to perform any past relevant work since May 27, 2009.  Ms. Bernard did not challenge this finding.

At step five, the ALJ found that Ms. Bernard was not disabled from the alleged disability onset date through November 7, 2016 because there were jobs in the national economy that she could perform.  Ms. Bernard challenged this finding.  The ALJ further found that, beginning on November 7, 2016, there were no jobs in the national economy that she could perform; accordingly, the ALJ found that Ms. Bernard became disabled on November 7, 2016 and was disabled through the date of the decision.  Ms. Bernard did not challenge this finding.

**E.    The Allegations of Error**

Ms. Bernard argued that the ALJ erred in finding that she first became disabled on November 7, 2016, after she was no longer insured for disability insurance benefits and no longer eligible for Medicare qualified government employee ("MQGE") benefits.

**F.    Analysis**

Ms. Bernard was injured in a workplace incident in 2009.  Diagnostic testing conducted in July 2009 showed a herniated disc at L5-S1.  This diagnosis was confirmed with further testing in March 2010, August 2010, and November 2012. Some of the physicians that Ms. Bernard saw recommended surgery, while others did not believe surgery would help her condition.  Her workers' compensation carrier delayed approval of the recommended surgery.  Ultimately, her treating physician recommended that Ms. Bernard undergo a lumbar laminectomy/fusion,

but by the time the surgery was approved by the workers' compensation carrier, Ms. Bernard decided not to have the recommended procedure.

The evidence in the record shows that, from at least mid-2013 forward, Ms. Bernard's complaints were consistent:  mid-back and low back pain radiating down her right leg into her right foot, with tingling and numbness accompanied by an inability to sit or stand for more than twenty minutes at a time.  She sometimes had positive straight leg raise tests, motor and reflex examinations were always intact, she sometimes walked with a limp, and she sometimes used a cane.

The ALJ found that Ms. Bernard had the residual functional capacity to perform the full range of sedentary work at all times after the alleged disability onset date but, beginning on November 7, 2016, would be off task 15% of the workday due to pain and the need for additional breaks.  Based on this assessment, the ALJ found that Ms. Bernard became disabled on November 7, 2016, stating that "beginning on November 7, 2016, the claimant's allegations regarding her symptoms and limitations are consistent with the evidence."[63]  Justifying that conclusion, the ALJ noted that "[d]uring a following-up appointment with Dr. Heard on November 7, 2016, the claimant asserted that she had to keep changing positions and had increased pain after sitting in one position greater than 20 minutes or

---

[63]     Rec. Doc. 7-1 at 20.

standing in one position greater than 20 minutes. . . . Dr. Heard determine [sic] the claimant was unable to work in any capacity."[64]  The ALJ found Dr. Heard's opinion that Ms. Bernard was unable to work in any capacity after November 7, 2016 to be "persuasive and consistent with the evidence of record."[65]

Ms. Bernard argued that this finding was not supported by substantial evidence in the record because nothing changed on November 7, 2016.  Specifically, she argued that "her symptomology and limitations remained the same."[66]   In response, the Commissioner argued that what had changed was the treating physician's opinion regarding her ability to work.  "Dr. Heard's opinion regarding [Ms. Bernard's] functional ability changed as of November 7, 2016."[67]   The Commissioner also argued that "[s]ubstantial evidence supports the ALJ's finding that [Ms. Bernard] could perform a full range of sedentary work prior to November 7, 2016, and became disabled due to an inability to stay as of that date."[68]

This Court does not understand the meaning of the phrase "an inability to stay."  If the Commissioner meant that, as of November 7, 2016, Ms. Bernard was

---

[64]     Rec. Doc. 7-1 at 20.

[65]     Rec. Doc. 7-1 at 21.

[66]     Rec. Doc. 8 at 5.

[67]     Rec. Doc. 9 at 5.

[68]     Rec. Doc. 9 at 6.

22

unable to stay in one position, i.e., sitting or standing for more than twenty minutes at a time, the argument lacks merit.  In the earliest of Dr. Heard's treatment notes in the record, dated May 29, 2013, and on other dates thereafter, the doctor stated that Ms. Bernard was unable to sit or stand for longer than twenty minutes at a time.  That was also Dr. Heard's impression in November 2016.  Thus, there was no change.

If the Commissioner meant that, as of November 7, 2016, Ms. Bernard was unable to stay focused on her work 100% of the workday but would be off-task for 15% of the day, that argument also lacks merit.  The vocational expert who testified at the hearing opined that a hypothetical person would be unemployable if he or she stayed off-task for 15% of the workday.  The ALJ found "that the claimant's severe impairments and related symptoms limit her to performing a modified range of sedentary work, which is supported by the objective medical record.  Due to degenerative disc disease and related pain symptoms, she is expected to be off task 15 percent of the workday."[69]  But the only reference to being off-task 15% of the workday is found in the vocational expert's hearing testimony, and there is no evidence in the record tying the vocational expert's testimony to any particular time period.  This Court found no evidence in the record that Dr. Heard or any other medical professional opined that Ms. Bernard's symptoms would result in her being

---

[69]     Rec. Doc. 7-1 at 21.

23

off-task 15% of the workday.  More important, Ms. Bernard had the same pain and other symptoms as well as the same diagnosis in May 2013 as she had on November 7, 2016.  Therefore, there is no evidentiary basis for finding that she would be off-task 15% of the day in November 2016 but not off-task that same amount in May 2013 or any other date after her May 2009 accident.

It appears that the ALJ's finding that Ms. Bernard was not disabled before November 2016 but was disabled on and after November 7, 2016 is based solely on the change in Dr. Heard's opinion regarding Ms. Bernard's functionality.  In her ruling, the ALJ expressly stated that she found Dr. Heard's opinion that Ms. Bernard was unable to work in any capacity after November 7, 2016 "persuasive and consistent with the evidence of record."[70]  But Dr. Heard also opined that Ms. Bernard was unable to work in any capacity from May 2013 until January 2016, and that opinion was based on the same diagnosis, the same symptoms, and the same functional deficits.  This Court does not understand why Dr. Heard's opinion of November 2016 was "persuasive" while the same opinion expressed repeatedly between May 2013 and December 2015 was not persuasive.  The only time period during which Dr. Heard opined that Ms. Bernard was capable of performing light or

---

[70]        Rec. Doc. 7-1 at 21.

sedentary work was between January and November 2016, and there is no clear evidence in the record as to why his opinion was different during that time period.

From May 2013 through August 2015, Ms. Bernard's treating physician, Dr. Heard, opined that she was unable to work in any capacity.  Dr. Heard's treatment note from September 2015 is inconsistent.  In that treatment note, he opined that she was permanently disabled from medium, heavy, and very heavy work but he also stated that her work status was unchanged, i.e., she was unable to work in any capacity.  In October, November, and December 2015, Dr. Heard again stated that Ms. Bernard's work status was unchanged.  On January 20, 2016, a vocational rehabilitation conference was held.  After reviewing Ms. Bernard's chart, diagnosis, restrictions, and then current treatment recommendations with a vocational rehabilitation counselor, Dr. Heard approved Ms. Bernard for sedentary work.  His treatment notes do not explain why Dr. Heard changed his opinion concerning Ms. Bernard's ability to work.  In February 2016, Dr. Heard changed his opinion again and stated that Ms. Bernard was approved for light and sedentary work.  Again, no basis for the change was explained.  He then reiterated that same opinion in March, May, June, July, and October 2016.  In November 2016, however, he changed his mind again and opined that Ms. Bernard was unable to work in any capacity.  The ALJ found this last opinion persuasive but did not find any of Dr. Heard's earlier opinions regarding Ms. Bernard's ability to work persuasive.  In fact, the ALJ stated

that she "will not defer or give any specific evidentiary weight, including controlling weight, to any prior. . . medical opinion(s), including those from your medical sources."[71]  Thus, the ALJ expressly refused to give any weight to any of Dr. Heard's opinions other than his opinion that, as of November 7, 2016, Ms. Bernard was no longer able to work in any capacity.

Ms. Bernard's application for benefits was filed after March 17, 2017. Therefore, the ALJ's duty to weigh medical opinions is governed by 20 C.F.R. 404.1520c.  Although an ALJ is no longer required to give controlling weight to a treating physician's medical opinions, the regulations state that "[w]hen a medical source provides one or more medical opinions. . . , we will consider those medical opinions. . . from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."[72]  The factors to be considered are the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factor which the claimant brings to the court's attention.[73]  The two most important factors are

---

[71]     Rec. Doc. 7-1 at 21.

[72]     20 C.F.R. § 404.1520c(a).

[73]     20 C.F.R. § 404.1520c(c)(1-5).

supportability and consistency.[74]  With regard to supportability, the regulation states

that "[t]he more relevant the objective medical evidence and supporting explanations

presented by a medical source are to support his or her medical opinion(s). . . , the

more persuasive the medical opinions. . . will be."[75]  With regard to consistency, the

regulation states that "[t]he more consistent a medical opinion(s). . . is with the

evidence from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion(s). . . will be."[76]  Thus, the regulation requires that

all of Dr. Heard's medical opinions were to be considered together, focusing

primarily on the supportability and consistency of his opinions.

But that is not what the ALJ did in this case.  Instead, the ALJ singled out one

of Dr. Heard's opinions and based her ruling on that one opinion.  Dr. Heard's

opinions from 2013, 2014, and 2015 that Ms. Bernard was unable to work in any

capacity are consistent with other evidence, supported with explanations from Dr.

Heard, and just as persuasive as his November 2016 opinion.  Still, the ALJ ignored

the earlier opinions.  This was error on the part of the ALJ.  The ALJ violated her

duty to weigh medical source opinions in accordance with agency regulations and

---

[74]     20 C.F.R. § 404.1520c(b)(2).

[75]     20 C.F.R. § 404.1520c(c)(1).

[76]     20 C.F.R. § 404.1520c(c)(2).

rulings, and to reject or discount those opinions only for good cause.[77] Consequently, the ALJ's residual functional capacity finding is not supported by substantial evidence in the record, and that erroneous finding led to the ALJ's equally erroneous conclusion that Ms. Bernard became disabled on November 7, 2016 but was not disabled before that date.

This was not harmless error.   An ALJ's error is harmless when it is inconceivable that a different administration conclusion would have been reached absent the error.[78]  In this case, the ALJ could have relied on Dr. Heard's earlier opinions or on Dr. Heard's earlier opinions in conjunction with his opinion of November 2016 and, in either case, could have concluded that Ms. Bernard became disabled earlier.  Therefore, the ALJ's decision to rely solely on the opinion set forth in Dr. Heard's treatment notes for Ms. Bernard's November 7, 2016 appointment was not a harmless error.

Although "the determination of residual functional capacity is the sole responsibility of the ALJ,"[79] a residual functional capacity finding must be supported by substantial evidence in the record.  Here, that is not the case.  Therefore, the

---

[77]     See *Kneeland v. Berryhill*, 850 F.3d 749, 759-61 (5th Cir. 2017).

[78]     See *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

[79]     *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012) (per curiam).

Commissioner's decision must be remanded for another evaluation of Ms. Bernard's residual functional capacity.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision should be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to reevaluate Ms. Bernard's residual functional capacity as of the alleged disability onset date of May 27, 2009 and thereafter.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[80]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[80]     See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[81]

Signed in Lafayette, Louisiana, this 8th day of October 2021.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[81]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).